624 S.E.2d 501

**Barbara CALHOUN, Individually and as the Executrix of the Estate of Robert L. Calhoun, Plaintiff Below, Appellant**

**v.**

**Jack R. TRAYLOR, Jr., M.D., an Individual; Tri–State Surgical Group, a Partnership; Robert E. Turner, M.D., an Individual; Ultimate Health Services, Inc., a West Virginia Corporation, D/B/A Huntington Internal Medicine Group; Denise Chambers, an Individual; and River Cities Anesthesia, Inc., a West Virginia Corporation, Defendants Below, Appellees.**

No. 32526.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 7, 2005.

Decided Nov. 17, 2005.

Concurring Opinion of Justice Davis Dec. 6, 2005.

Concurring and Dissenting Opinion of Justice Starcher Dec. 16, 2005.

Gerard R. Stowers, J. Mark Adkins, Bowles Rice McDavid Graff & Love, L.L.P., Charleston, for the Appellant.

Don R. Sensabough, Jr., Jeffrey M. Wakefield, Elizabeth S. Cimino, Flaherty, Sensabaugh & Bonasso, P.L.L.C., Charleston, for the Appellees, Jack R. Traylor, Jr., M.D. and Tri–State Surgical Group.

Michael J. Farrell, Tamela J. White, Neisha Ellis Brown, Farrell, Farrell & Farrell, L.C., Huntington, for the Appellees, Robert E. Turner, M.D. and Denise Chambers.

Thomas J. Hurney, Jr., Jeff C. Woods, Jackson Kelly, P.L.L.C., Charleston, for the Appellee, River Cities Anesthesia, Inc.

PER CURIAM:

This is an appeal by Barbara Calhoun (hereinafter "Appellant"), individually and as executrix of the estate of her deceased husband, Robert Calhoun, from an order of the Circuit Court of Cabell County granting partial summary judgment in favor of the Appellees/defendants in the underlying medical malpractice action.[1] The lower court premised the partial summary judgment upon its

---

1. The Appellees include Jack Traylor, M.D.; Tri–State Surgical Group; Robert E. Turner, M.D.; Ultimate Health Services, Inc., d/b/a Huntington Internal Medicine Group; Denise Chambers; and River Cities Anesthesia, Inc.

finding that a supplemental report submitted by one of the Appellant's experts, Dr. Paul vonRyll Gryska, did not satisfy the requirement that the Appellants must present expert testimony stating that the standard of care had been breached in the post-surgical care of the decedent. The Appellant maintains that the lower court erred by refusing to consider Dr. Gryska's affidavit and by granting partial summary judgment in favor of the Appellees. Having thoroughly reviewed the record, briefs, and applicable precedent, this Court affirms the decision of the lower court.

## I.   Factual and Procedural History

On May 12, 1997, Mr. Robert Calhoun was evaluated by Dr. Jack Traylor regarding possible hernia surgery. Previously undiagnosed hypertension was discovered, and blood pressure medication was initiated. On May 27, 1997, laparoscopic hernia surgery was performed, despite the existence of continued high blood pressure. On May 29, 1997, Mr. Calhoun suffered a stroke, paralyzing his speech and the left side of his body.

By late June 1997, Mr. Calhoun's wife, Appellant Barbara Calhoun, contacted another physician, Dr. David Denning, to examine Mr. Calhoun in an effort to determine the source of his continuing medical difficulties. Dr. Denning discovered that Mr. Calhoun had suffered a bowel perforation that had previously been undiagnosed. Emergency bowel surgery was performed by Dr. Denning, and a colostomy and feeding tube were installed.

On May 12, 1999, Mr. and Mrs. Calhoun filed a medical malpractice civil action against the Appellees, alleging (1) negligence in the performance of surgery despite elevated blood pressure; and (2) failure to diagnose and treat the perforated bowel during post-stroke hospitalization. On July 5, 2000, Mr. Calhoun died, and a wrongful death claim was thereafter added to the civil action. The Amended Complaint alleged medical malpractice in the treatment of Mr. Calhoun prior to the surgery, during the surgery, and the post-surgical care by failing to timely diagnose and treat resulting infections.

The deposition of Dr. Gryska was taken on December 16, 2003. In that deposition, Dr. Gryska indicated that there had been a deviation from standard of care in the initial decision to perform surgery. However, Dr. Gryska would not say that there was a deviation from the standard of care in the post-surgical treatment of Mr. Calhoun. Motions for partial summary judgment were thereafter filed by the Appellees based upon the absence of expert testimony that there was a deviation from the standard of care in the post-surgical period.

Dr. Denning, the physician who had performed the bowel surgery, was deposed on February 10, 2004. In his deposition, Dr. Denning explained the necessity for the abdominal surgery, indicating that tests had shown the presence of free air in the abdomen and ruptured diverticula. Dr. Denning declined to state that there had been a deviation from the standard of care in the post-surgical treatment. By supplemental affidavit dated February 29, 2004, and based upon Dr. Denning's explanations, Dr. Gryska altered his original position and asserted that indeed there had been a deviation from the standard of care in the post-surgical care, regarding the abdominal complications and the requirement for bowel surgery.

In assessing the partial summary judgment motions, the lower court refused to consider the supplemental affidavit of Dr. Gryska and granted partial summary judgment to the Appellees, finding that the Appellant had failed to present expert testimony that there had been a deviation from the standard of care by any of the Appellees in the post-surgical treatment of Mr. Calhoun. The lower court disregarded Dr. Gryska's supplemental affidavit based upon the guidance of the Fourth Circuit Court of Appeals in *Rohrbough v. Wyeth Laboratories, Inc.,* 916 F.2d 970 (4th Cir.1990), discussed in detail below. The Appellant now appeals to this Court.

## II.   Standard of Review

This Court has consistently held that "[a] circuit court's entry of summary judgment is reviewed *de novo.*" Syl. Pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). In syllabus point five of *Aetna Casualty & Surety Co. v. Federal Insurance Co.,* 148

W.Va. 160, 133 S.E.2d 770 (1963), this Court stated that "[t]he question to be decided on a motion for summary judgment is whether there is a genuine issue of fact and not how that issue should be determined." With specific emphasis on medical malpractice issues, this Court has also stated that "[a] trial court is vested with discretion under W.Va.Code § 55–7B–7 (1986) to require expert testimony in medical professional liability cases, and absent an abuse of that discretion, a trial court's decision will not be disturbed on appeal." Syl. Pt. 8, *McGraw v. St. Joseph's Hosp.*, 200 W.Va. 114, 488 S.E.2d 389 (1997). This Court also pointed out in *Neary v. Charleston Area Medical Center, Inc.*, 194 W.Va. 329, 460 S.E.2d 464 (1995) that "[w]hen the principles of summary judgment are applied in a medical malpractice case, one of the threshold questions is the existence of expert witnesses opining the alleged negligence." 194 W.Va. at 334, 460 S.E.2d at 469.

■ This Court has also expressed that under Rule 56(c) of the West Virginia Rules of Civil Procedure, " ' "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).' Syllabus Point 1, *Andrick v. Town of Buckhannon*, 187 W.Va. 706, 421 S.E.2d 247 (1992)." Syl. Pt. 1, *Williams v. Precision Coil, Inc.*, 194 W.Va. 52, 459 S.E.2d 329 (1995). In order to prevail on a motion for summary judgment, the movant must demonstrate that there is no evidence to support the non-movant's case and "that the evidence is so one-sided that the movant must prevail as a matter of law." *Tolliver v. Kroger Co.*,

201 W.Va. 509, 513, 498 S.E.2d 702, 706 (1997).

## III. Discussion

### A. Sham Affidavit Rule: *Kiser v. Caudill*

■ The lower court granted partial summary judgment to the Appellees based upon the Appellant's failure to produce a medical expert to testify that there had been a deviation from the standard of care in the post-surgical treatment of Mr. Calhoun. This Court has consistently emphasized that "[i]t is the general rule that in medical malpractice cases negligence or want of professional skill can be proved only by expert witnesses." Syl. Pt. 2, *Roberts v. Gale*, 149 W.Va. 166, 139 S.E.2d 272 (1964). West Virginia Code § 55–7B–7 (2003) (Supp.2005), expressly provides, in pertinent part, that "[t]he applicable standard of care and a defendant's failure to meet the standard, if at issue, shall be established in medical professional liability cases by the plaintiff by testimony of one or more knowledgeable, competent expert witnesses if required by the court." [2] As explained above, the circuit court has discretion to resolve the issue of requiring an expert witness, and that discretion will not ordinarily be disturbed. *See Short v. Appalachian OH–9, Inc.*, 203 W.Va. 246, 253, 507 S.E.2d 124, 131 (1998). [3]

In finding that the Appellant had failed to produce expert testimony that the standard of care had been breached by any of the Appellees in post-surgical care, the lower court utilized the reasoning of the Fourth Circuit Court of Appeals in *Rohrbough* to evaluate the supplemental affidavit of Dr. Gryska offered by the Appellant. In *Rohrbough*, a plaintiffs' expert had initially re-

---

**2.** Further, West Virginia Code § 55–7B–3 (2003) (Supp.2005) provides that a plaintiff in a medical malpractice action must prove that a health care provider deviated from the applicable standard of care and that this deviation was the proximate cause of injury to the plaintiff. Specifically, the statute provides, in pertinent part, as follows:

    (a) The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care:

    (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and

    (2) Such failure was a proximate cause of the injury or death.

**3.** The lower court noted that the "Plaintiff concedes that expert testimony is required in this case as shown by the multiple expert disclosure she has made with respect to the same."

fused to state that there was a causal link between a vaccine and a child's seizure disorder. 916 F.2d at 975. When confronted with a motion for summary judgment, however, the expert had submitted an affidavit asserting that the vaccine had indeed caused the injuries in question. *Id.* The Fourth Circuit declared in *Rohrbough* that " '[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." ' *Id.* (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984)).

After the lower court's partial summary judgment order was entered in the present case, this Court specifically validated the *Rohrbough* approach in *Kiser v. Caudill*, 215 W.Va. 403, 599 S.E.2d 826 (2004). In *Kiser*, this Court addressed attempts to utilize supplemental affidavits contradicting prior testimony to defeat a motion for summary judgment and held as follows at syllabus point four:

> To defeat summary judgment, an affidavit that directly contradicts prior deposition testimony is generally insufficient to create a genuine issue of fact for trial, unless the contradiction is adequately explained. To determine whether the witness's explanation for the contradictory affidavit is adequate, the circuit court should examine: (1) Whether the deposition afforded the opportunity for direct and cross-examination of the witness; (2) whether the witness had access to pertinent evidence or information prior to or at the time of his or her deposition, or whether the affidavit was based upon newly discovered evidence not known or available at the time of the deposition; and (3) whether the earlier deposition testimony reflects confusion, lack of recollection or other legitimate lack of clarity that the affidavit justifiably attempts to explain.

In the present case, the lower court utilized the type of analysis adopted in *Kiser* and found that Dr. Gryska's supplemental affidavit directly contradicts his earlier deposition testimony and actually relies upon evidence Dr. Gryska admittedly reviewed in preparation for his original deposition. The only additional item reviewed by Dr. Gryska for his supplemental affidavit was Dr. Denning's testimony concerning the medical evidence previously reviewed by Dr. Gryska. The lower court did not consider that testimony to be newly discovered evidence not known at the time of Dr. Gryska's original deposition. Specifically, *Kiser* "precludes a party from creating an issue of fact to prevent summary judgment by submitting an affidavit that directly contradicts previous deposition testimony of the affiant." 215 W.Va. at 409, 599 S.E.2d at 832. Thus, the lower court refused to consider Dr. Gryska's supplemental affidavit as support for the Appellant's contention that Dr. Traylor deviated from the standard of care in the post-surgical procedures. The lower court properly analyzed the issues regarding the supplemental affidavit and properly concluded that it should not be considered. We therefore find no error in the lower court's refusal to consider Dr. Gryska's supplemental affidavit.

### B. Appropriateness of Partial Summary Judgment

Based upon what this Court has deemed a proper analysis of the supplemental affidavit issue, the lower court disregarded Dr. Gryska's supplemental affidavit in its determination of the appropriateness of the Appellees' motions for partial summary judgment. Thus, the lower court properly concluded that although the Appellant had presented expert testimony regarding the deviation from the standard of care with regard to the initial decision to perform surgery, preserving that issue for further proceedings against the Appellees, the Appellant had failed to present expert testimony that any post-surgical deviation from the standard of care had been committed by any Appellee. As the lower court stated, "there can be no question of fact where plaintiff's standard of care expert does not establish that there was a deviation from an applicable standard of care by the physician."

In light of such absence of necessary expert testimony, we find that it was appropriate to utilize partial summary judgment as a

method of narrowing the triable issues[4] to only those acts of alleged negligence upon which the Appellant had presented expert testimony that a deviation from the standard of care had occurred. Specifically, the lower court protected the Appellant's right to receive a complete evaluation of her allegations of medical malpractice in Mr. Calhoun's pre-surgical and surgical care, properly supported by expert testimony of deviation from the standard of care.[5] The lower court's grant of partial summary judgment does not prevent the Appellant from asserting that medical malpractice was committed with regard to the decision to proceed with Mr. Calhoun's hernia repair surgery despite the presence of hypertension. Nor does it prevent the Appellant from presenting evidence that such malpractice caused or contributed to the resulting events, including the course of post-surgical care and recovery leading to and including Mr. Calhoun's death.[6] Such issues remain for determination by the trier of fact and are not defeated by the partial summary judgment granted by the lower court with regard to only that portion of the allegations for which the Appellant has not presented the necessary expert testimony. Based upon the foregoing, this Court affirms the decision of the Circuit Court of Cabell County.

Affirmed.

DAVIS, J., concurring.

(Filed Dec. 6, 2005)

The majority opinion in this case found that, in granting a partial summary judgment in favor of the defendants below, the circuit court correctly rejected, as a sham affidavit, a supplemental report submitted by one of the plaintiff's experts in response to the motion for partial summary judgment. I concur completely in this resolution of the instant action. I write separately in order to further discuss the sham affidavit rule, to clarify its *proper* use, and to elaborate on its application in this case.

I feel it is important to emphasize that the sham affidavit rule is not intended, and should not be used, to prevent expert witnesses from clarifying, or even changing, their opinions.[1] Indeed, Rule 26(e)(1)(B) of the West Virginia Rules of Civil Procedure anticipates that the substance of an expert's expected testimony may change and requires the supplementation of discovery responses in that event:

**4.** *See Bakker v. First Fed. Sav. & Loan Assn.*, 575 So.2d 222, 224 (Fla.App. 3 Dist.1991) ("[T]he purpose of the partial summary judgment procedure is to narrow the issues in a case so as to limit the matters genuinely in dispute which must be taken to trial").

**5.** The order granting partial summary judgment expressly provides as follows:

The movants do not contend that the plaintiff failed to meet the threshold requirement for expert testimony to create a jury issue with respect to the performance of the inguinal hernia repair surgery. The movants advised the court that they are prepared to present competent expert testimony contra to plaintiff's claims in that regard and that there are jury issues as to the same.

**6.** As this opinion has made clear, this does not entitle the Appellant to treat the course of post-operative care as an additional event of malpractice.

**1.** For example, we approved of an affidavit reflecting a change in an expert's opinion in *State ex rel. Krivchenia v. Karl*, 215 W.Va. 603, 600 S.E.2d 315 (2004) (per curiam). In *Krivchenia*, this Court found that the circuit court had erred in granting, in part, a motion in limine to prevent a defense expert from testifying regarding the applicable standard of care. This Court's finding was based on an affidavit in which the expert expressed a view he had previously declined to express. The affidavit was attached to the plaintiff's motion asking the circuit court to reconsider its ruling on the motion in limine. With respect to the affidavit, this Court explained that the expert

stated during his deposition that he did not understand the legal definition of standard of care and, therefore, that he would not render an opinion on the standard of care. However, during the motion for reconsideration, [the expert] submitted an affidavit indicating that, "I have been advised that standard of care in West Virginia for a physician is 'what a reasonably prudent physician in the same or similar circumstances would do.'" The affidavit stated further that "having been informed of the legal definition of standard of care as it applies to [the defendant doctor], I am of the opinion, as I always have been, that [the defendant] did not deviate from the standard of care in regards to his care and treatment of Jamison Piatt."

*Id.* at 607–08, 600 S.E.2d at 319–20 (footnote omitted).

[a] party is under a duty seasonably to supplement that party's response with respect to any question directly addressed to: (B) The identity of each person expected to be called as an expert witness at trial, the subject matter on which the expert is expected to testify, *and the substance of the expert's testimony.*

(Emphasis added).

As opposed to precluding an expert from clarifying or changing his or her opinion, the true purpose of the sham affidavit rule is to prevent a party from resisting summary judgment by filing an affidavit that directly contradicts earlier deposition testimony when there is no satisfactory explanation for the change of opinion.[2] *See Kiser v. Caudill,* 215 W.Va. 403, 409, 599 S.E.2d 826, 832 (2004) ("Basically, the 'sham affidavit' rule precludes a party from creating an issue of fact to prevent summary judgment by submitting an affidavit that directly contradicts previous deposition testimony of the affiant."); *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 60 n. 12, 459 S.E.2d 329, 337 n. 12 (1995) ("[W]hen a party has given clear answers to unambiguous questions during a deposition or in answers to interrogatories, he does not create a trialworthy issue and defeat a motion for summary judgment by filing an affidavit that clearly is contradictory, where the party does not give a satisfactory explanation of why the testimony has changed."). *See also Tolley v. Carboline Co.,* 217 W.Va. 158, 165, 617 S.E.2d 508, 515 (2005) (per curiam) ("[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact.") (quoting *Kiser,* 215 W.Va.

403, 409, 599 S.E.2d 826, 831 (additional quotations and citations omitted)).

In order to demonstrate that the instant case falls squarely within this rule, I will provide additional factual details, that were omitted from the majority opinion, regarding the opinion of Dr. Paul vonRyll Gryska, the plaintiff's expert witness.

Dr. Gryska prepared an expert disclosure dated November 23, 2003. In the disclosure, Dr. Gryska expressly states:

At your request, I have studied the extensive records for Mr. Robert Calhoun beginning in May 1997. These records include the St. Mary's Hospital admissions on May 27 and again two days later on May 29 as well as office records of Dr. Jack Traylor, Jr. and Dr. Robert Turner.

With respect to Mr. Calhoun's post-operative care, the disclosure states, in pertinent part,

Most of the events that followed hospitalization on May 29, 1997 were related to his stroke either directly or indirectly. During the several days after hospitalization, he developed a fever and evaluation of the abdomen found free air in the abdomen. Repeat x-ray four days later again found free air. *This was a change from admission where a chest xray was normal* (abdominal air is assessed on chest x-ray; often called free air under the diaphragm) and his white blood cell count was normal. Dr. Traylor was consulted to assess the Patient's abdomen in the face of worsening sepsis. He concluded that the abdominal air was a residual finding from surgery now nine days previously. This was an *incorrect assessment and not compatible with the physiology of laparoscopic insufflation*

The process of inflating the abdominal cavity or preperitoneal space as was the case

---

**2.** This purpose is clearly demonstrated by Syllabus point 4 of *Kiser v. Caudill,* which holds that, [t]o defeat summary judgment, an affidavit that directly contradicts prior deposition testimony is generally insufficient to create a genuine issue of fact for trial, unless the contradiction is adequately explained. To determine whether the witness's explanation for the contradictory affidavit is adequate, the circuit court should examine: (1) Whether the deposition afforded the opportunity for direct and cross-

examination of the witness; (2) whether the witness had access to pertinent evidence or information prior to or at the time of his or her deposition, or whether the affidavit was based upon newly discovered evidence not known or available at the time of the deposition; and (3) whether the earlier deposition testimony reflects confusion, lack of recollection or other legitimate lack of clarity that the affidavit justifiably attempts to explain.
215 W.Va. 403, 599 S.E.2d 826 (2004).

with Mr. Calhoun (the abdomen was never actually entered) uses carbon dioxide or CO2. This is removed from the body in a matter or hours after surgery not days and certainly not nine days. It is my understanding from reading the records that Dr. Traylor failed to recognize the abdominal catastrophe developing in Mr. Calhoun's abdomen.

In the face of recent stroke there are many sources for infection and many physiologic changes that are directly related to the stroke and many are a consequence of the immobilization and catheterization and altered physiology indirectly related to the stroke....

(Emphasis added). As the foregoing disclosure demonstrates, Dr. Gryska was aware of the normal x-ray that was taken at the time of Mr. Calhoun's admission, and of the fact that free air was subsequently discovered in Mr. Calhoun's abdomen. He further opined that Dr. Traylor "failed to recognize the abdominal catastrophe developing in Mr. Calhoun's abdomen." However, Dr. Gryska did not conclude that this particular failure on the part of Dr. Traylor was below the proper standard of care. Instead, Dr. Gryska indicates that, due to Mr. Calhoun's stroke, there were many potential sources for the complications Mr. Calhoun was experiencing and it was not below the standard of care for Dr. Traylor to fail to specifically identify their exact cause.

Dr. Gryska's opinion that Dr. Traylor did not fall below the appropriate standard of care by failing to recognize the true nature of Mr. Calhoun's post-operative complications was expressed more clearly when he was deposed by the defense on December 16, 2003. During that deposition, Dr. Gryska testified that he could not state that Dr. Traylor had deviated from the standard of care in his post-operative treatment of Mr. Calhoun, and even went so far as to say that Dr. Traylor had not been negligent. Again, Dr. Gryska relied on the fact that, due to Mr. Calhoun's stroke, there were many potential causes for the adverse symptoms Mr. Calhoun was experiencing:

Q Okay. For instance, let's talk about the postoperative care that you reference in your report. Tell me, do you have any opinions that the postoperative care that was rendered by Dr. Traylor somehow deviated from the standard of care?

A. No.

Q. Just so I'm clear then, it is not your intent to come to trial and testify that Dr. Traylor deviated from the standard of care in the manner in which he treated this Patient from a postoperative perspective?

A. Well, this was an unusual postoperative perspective and unusual postoperative course. *I believe Dr. Traylor was wrong in his review of the x-rays and assessment of the Patient. The problem comes in that there's a lot of explanations sometimes after a patient has had a stroke. There's so many physiologic changes that occur, there are too many explanations and too many variables to describe, to ascribe, to state with certainty, that there is a standard of care.* I believe Dr. Traylor made an error when assessing the Patient. It is a lot harder to call that a violation of the standard of care.

Q. So we are clear, you do not intend to render any opinions at trial that Dr. Traylor was negligent or breaching the standard of care in his management of the Patient during the postoperative period, is that correct?

A. Correct.

Q. Do you have any other opinions with respect to Doctor Traylor's treatment in this matter?

A. Yes. I think he failed to recognize the severity of a new problem inside Mr. Calhoun's tummy, but again I told you that was—there were so many other explanations that I do not believe it was a violation of the standard of care. It was not negligence.

Deposition of Dr. Paul vonRyll Gryska, December 16, 2003, at 80–82.

At the outset of his deposition, Dr. Gryska described the extensive records he was given to review in connection with this case:

I was provided with all of the records at one time which includes many of the rehab records and the chronic facility records that Mr. Calhoun evolved while he was going through the next year or so. I don't think I have every single thing from the time of his surgery through his death, but I have many of the post hospital records.

The ones I have here today include the original medical records from his operation, his day surgical procedure in May of 1997, his readmission to the hospital on May 29th, 1997, and his hospitalization for the next month. I also have depositions here for Mrs. Calhoun, Doctor Traylor, Doctor Stone, and Doctor Turner.

Deposition of Dr. Paul vonRyll Gryska, December 16, 2003, at 5–6.

Based upon the foregoing details of Dr. Gryska's expert disclosure and deposition testimony, it is clear that in reaching his ultimate conclusion that he was unable to state that Dr. Traylor had fallen below the standard of care with respect to Mr. Calhoun's post-operative treatment, Dr. Gryska had reviewed Mr. Calhoun's extensive medical records, had known of the absence of free air in Mr. Calhoun's abdomen upon his post-stroke admission to the hospital on May 29, 1997, and had also known of the presence of free air a few days later.

Nevertheless, after the defendants filed a motion for partial summary judgment on the issue of Mr. Calhoun's post operative medical treatment, which cited the absence of expert testimony stating that Dr. Traylor had breached the standard of care as grounds for summary judgment on this issue, Dr. Gryska filed a supplemental report reversing his opinion on this issue. Contrary to his earlier statements, in his supplemental report Dr. Gryska opined that Dr. Traylor's failure to recognize that Mr. Calhoun had developed a new problem and his failure to properly advise the medical team and conduct further investigation of the problem "was indeed beneath [the] standard of care." Dr. Gryska pointed to the newly obtained deposition testimony of Dr. David Denning, the physician who diagnosed and performed surgery on Mr. Calhoun's bowel perforation, as the foundation of his changed opinion. However, a careful reading of Dr. Gryska's supplemental report reveals that the medical data relied upon therein was the same data he had discussed in his expert disclosure and deposition testimony:

Dr. Denning reiterates the findings on the chart, both radiologic and clinical and points out clearly that admission chest x-ray found no free air and that a change in clinical status prompted further x-rays which found free air on June 4, 1997. Dr. Traylor was consulted to assess the patient's abdomen in the face of worsening sepsis. His note, dated June 5, indicates that there was free air present on admission yet this was not the case. The x-ray report suggests that this new free air was from a perforated viscus.

Given new symptoms, fever, somnolence, and worsening sepsis, the finding of free air on chest x-ray when it was not there before mandates further evaluation. At the very minimum more radiologic evaluation should have been recommended and ordered. This would have answered the question of a perforated viscus and/or free air. Surgical intervention at this time would have dramatically shortened this hospital admission and possibly avoided much of his physiologic injury and prolonged convalescence.

Plainly, Dr. Gryska's revised opinion was based upon the initial absence and subsequent presence of free-air in Mr. Calhoun's abdomen, in combination with other symptoms from which Mr. Calhoun was suffering. As I demonstrate above, Dr. Gryska had all of this information at the time he rendered his initial report and gave his deposition testimony. Both in his expert disclosure and in his deposition testimony, Dr. Gryska stated that he had reviewed all of Mr. Calhoun's hospital records. In addition, the expert disclosure made specific references to the absence and subsequent presence of free air in Mr. Calhoun's abdomen. Accordingly, it is without question that Dr. Gryska's supplemental report was properly rejected as a sham affidavit in that it (1) directly contradicted his earlier statements; (2) was filed in response to a motion for summary judgment, and (3) was based upon medical data that had been reviewed by Dr. Gryska prior to his earlier statements. Moreover, Dr. Gryska

testified thoroughly during his deposition and he did not experience any confusion, lack of recollection or other legitimate lack of clarity at that time that would justify the supplemental report. *See* Syl. pt. 4, *Kiser*, 215 W.Va. 403, 599 S.E.2d 826.[3]

In conclusion, I reflect on the comments of Justice Starcher in his concurring opinion in *Kiser*,

> An expert witness's understanding of a case, and testimony on a legal opinion, can change with time. An expert witness, who is unfamiliar with a particular issue in a deposition, can become familiar with the issue after a deposition by doing additional research or testing. An expert brings experience to the courtroom, and uses that experience to assist the jury in understanding the facts. If the expert's experience changes, resulting in a change in the expert's opinion or other deposition testimony, then the party offering the expert is entitled to amend the expert's testimony through use of an affidavit. But that affidavit had also better list some pretty good reasons for the change in the expert's testimony.

*Kiser*, 215 W.Va. at 411–12, 599 S.E.2d at 834–35. In this case, there simply was no good reason for Dr. Gryska's change in opinion, and the rejection of his supplemental report as a sham affidavit was proper.

STARCHER, J., concurring, in part, and dissenting, in part.

(Filed Dec. 16, 2005)

I concur with that portion of the majority's opinion affirming the circuit court's decision to allow some of the appellant's claims against the appellees to proceed to trial. I dissent, however, to the majority's discussion concerning the "sham affidavit" rule. To the extent portions of the appellant's claims were dismissed by the circuit court because of the rule, the opinion should have reversed the circuit court.

This case is yet another example of the problems with the "sham affidavit" rule. Upon further reflection, I believe this Court should now abandon the rule as contrary to unambiguous language of the *Rules of Civil Procedure*, and contrary to a citizen's constitutional right to have their disputes tried before a jury.[1]

In a trial, a witness may testify and say something that directly contradicts a statement previously made by the witness under oath. Any party, if they so choose, can then use the prior inconsistent statement to impeach the testimony of the witness.[2] We let juries sort out which of the two statements by the witness is more credible.

But at the summary judgment stage, we have virtually adopted the opposite procedure. Ostensibly, "the 'sham affidavit' rule precludes a party from creating an issue of fact to prevent summary judgment by submitting an affidavit that directly contradicts previous deposition testimony of the affiant." *Kiser v. Caudill*, 215 W.Va. 403, 409, 599 S.E.2d 826, 832 (2004). When a court is faced with an affidavit that is inconsistent

---

3. Likewise, in *Kiser v. Caudill*, 215 W.Va. 403, 599 S.E.2d 826, there was simply no justification for the expert's change in opinion. The expert in *Kiser* had testified during his deposition that "he only knew the standard of care with regard to tethered spinal cords at the hospital where he was working in 1973, which was the Children's Hospital in Columbus, Ohio." 215 W.Va. at 408, 599 S.E.2d at 831. Upon repeated questioning, the expert maintained that he did not possess knowledge of the standard of care at other places during that period of time. *Id.* Following a motion for summary judgement, however, the expert tendered an affidavit that "completely contradicted his deposition testimony without any explanation." *Id.*

1. Article III, § 13 of the *West Virginia Constitution* states, in part:

> In suits at common law, where the value in controversy exceeds twenty dollars exclusive of interest and costs, the right of trial by jury, if required by either party, shall be preserved.... No fact tried by a jury shall be otherwise reexamined in any case than according to rule of court or law.

2. For example, Rule 801(d)(1)(A) [1994] of the *Rules of Evidence* states:

> A statement is not hearsay if ... the declarant testifies at trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition[.]

with the witness's deposition testimony, the court can disregard the affidavit as a "sham" that is insufficient to create a genuine issue of fact for trial, unless the inconsistency is adequately explained by the witness. The result is that some allegedly inconsistent affidavits will be stricken from the record; other affidavits may be considered if the judge decides that the inconsistency is the product of an innocent misunderstanding of the question by the witness, nervousness at the deposition, a refreshed recollection or—particularly in the case of an expert—a change in opinion based upon a change in the information available to the witness.

The problem is that different judges will interpret the "sham affidavit" rule differently in the same circumstances. Different judges will give different reactions to whether the affiant gave a credible explanation for the contradiction between the deposition and the affidavit, or "a satisfactory explanation of why the testimony is changed ... and why this later assertion should be taken seriously." 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure, 3d Ed.* § 2726 (1998).

Frankly, I believe that the "sham affidavit" rule adds nothing but confusion, unfairness, and absurdity to the summary judgment process. Think of it this way: on the one hand, Rule 56(e) permits a party to file an affidavit in opposition to a motion for summary judgment based "on personal knowledge" of a competent witness and setting forth "such facts as would be admissible in evidence." [3] Standing alone, so long as the affidavit meets these standards, no matter how incredible or absurd the affidavit may seem when compared against a mountain of extrinsic evidence, the party can defeat an opponent's

motion for summary judgment. But on the other hand, if "that same affidavit allegedly conflicts with nothing more than a few lines of arguably inconsistent transcript taken from the middle of a five-day deposition, we are told, the affidavit is a potential 'sham' that may be stricken and utterly disregarded, possibly resulting in dismissal of the action with prejudice, depending entirely on whether the judge deems the putative explanation for the variation to be 'satisfactory' or 'credible.' The incongruity and incoherence of that disparate treatment is ludicrous." James Joseph Duane, "The Four Greatest Myths About Summary Judgment," 52 Wash. & Lee L.Rev. 1523, 1600 (1995).

The "sham affidavit" rule that we adopted in *Kiser v. Caudill* is contradicted by the unambiguous language of Rule 56(e) of the *Rules of Civil Procedure.* Rule 56(e)

... outlines a number of detailed requirements for supporting and opposing affidavits but contains no requirement that they be "consistent with all prior statements made by the witness." Under normal principles of statutory construction ... the specification of certain detailed requirements normally implies the deliberate exclusion of all others. Indeed, Rule 56 affirmatively states that affidavits may include "such facts as would be admissible in evidence," which would include all statements of a witness who claims to have first-hand knowledge, even if the judge knows in advance that those statements are inconsistent with what the witness has said before.

52 Wash. & Lee. L.Rev. at 1601–02.

This Court should simply abandon the ridiculous fiction of the "sham affidavit" rule, and stop putting judges in the position of

---

**3.** Rule 56(e) of the *Rules of Civil Procedure* [1998] states:

*Form of affidavits; further testimony; defense required.*—Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, an-

swers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

feeling compelled to deprive citizens of their constitutional right to have their claims heard, on their merits, in court and before a jury. Instead of using the "sham affidavit" rule, courts should use affidavits in summary judgment proceedings in the following way:

> When a judge ruling upon a summary judgment motion is confronted with an affidavit in opposition that is at least arguably inconsistent with prior testimony or statements by that same witness on a material question, the judge need not, and should not, "assume the truth" of the affidavit nor even worry about what the truth is.... Nor should he try to make any findings concerning whether there is an inconsistency, whether he is satisfied with the explanation for the variation, or which version is more credible (as virtually all of the lower courts have done). Rather, ... the judge should ask himself one simple question: "Assuming that all of the witnesses would testify at a trial just as they have in their most recent affidavits, that they are cross-examined about the allegedly inconsistent statements they made at their depositions, and that the jury hears the same explanation I have been given (if any) about the variation, is there any genuine possibility that the jury might find in favor of the adverse party?"

This simple solution, unlike the three approaches currently taken by the federal courts, is simple in application, coherent, and correct. It eliminates the current need for worthless and time-consuming motion practice over whether the alleged "sham" affidavit should be stricken or whether the defect was waived by the failure of the moving party to also file a written motion to strike the affidavit. It preserves and safeguards the constitutionally guaranteed role of the jury as arbiters of disputable factual issues. And it still permits the judge to weed out those truly sham affidavits that have no possibility of being accepted by any jury.

Duane, 52 Wash. & Lee L.Rev. at 1603–04.

I believe that, in this case, we should have abandoned the rule we adopted in *Kiser v. Caudill.* In his deposition, Dr. Paul vonRyll Gryska would not say that there was a deviation from the standard of care in the post-surgical treatment of the plaintiff's decedent, Robert Calhoun. But after reviewing the deposition testimony of one of the decedent's treating physicians, Dr. Gryska signed an affidavit that indicated that, in fact, a deviation from the standard of care in the post-surgical treatment had occurred.

When the circuit judge was faced with the affidavit by Dr. Gryska that was at variance with a prior statement he made in a deposition, the judge should not have interjected credibility determinations into the summary judgment process. The judge should not have ignored Dr. Gryska's supplemental affidavit as a "sham." The judge should instead have asked one question: assuming that Dr. Gryska testifies at trial just as he has in his most recent affidavit, and he is cross-examined about the allegedly inconsistent statement he made at his deposition, and the jury heard the same explanation for the variation, is there any genuine possibility that the jury might find in favor of the plaintiff?

I therefore dissent to the majority opinion's use of the "sham affidavit" rule in this case.